Filed 5/6/21  P. v. Castanedo CA4/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D076838 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN381820) |
| WALTER NORBERT CASTANEDO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Carlos O. Armour, Judge.  Affirmed and remanded with directions.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters and Julie L. Garland, Assistant Attorneys General, Charles C. Ragland and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Walter Norbert Castanedo of multiple offenses against his granddaughter, A.C., namely oral copulation/sexual penetration with a

child 10 years old or younger (Pen. Code,[1] § 288.7, subd. (b); counts 1-10), sexual penetration by force (§ 289, subd. (a)(1)(A); counts 11, 12), and forcible lewd acts on a child (§ 288, subd. (b)(1); counts 13-20 and 23-30). The jury found true allegations that as to counts 15 through 20, 23 and 24 he had substantial sexual conduct with a child under the age of 14 (§ 1203.066, subd. (a)(8)). The trial court sentenced Castanedo to 150 years to life plus 112 years consisting of 15-year-to-life terms on counts 1 through 10, 12-year upper terms on counts 11 and 12, and eight-year upper terms on counts 13 through 20, and 23 through 30. The court stayed under section 654 the sentences on counts 11 through 14 and ordered the sentences on the remaining counts to run consecutively.

Castanedo contends the trial court prejudicially erred and violated his constitutional rights to due process, a fair trial, and to confront witnesses by allowing an expert to testify about certain characteristics of child sexual abuse victims and to relate the opinions of other nontestifying experts. He further contends the prosecutor committed prejudicial misconduct by eliciting sympathy for A.C., misrepresenting the burden of proof, and misstating the law. We reject these contentions and accordingly affirm the judgment. However, we direct the trial court to correct clerical errors in the abstract of judgment as to counts 13 and 14 and thus remand with directions set forth below.

FACTUAL AND PROCEDURAL BACKGROUND

Castanedo does not challenge the sufficiency of the evidence of his convictions, so we summarize only the evidence necessary to address his claims of evidentiary error and prosecutorial misconduct. Castanedo began inappropriately touching A.C., or making A.C. inappropriately touch him, in

---

[1] Undesignated statutory references are to the Penal Code.

about 2009 when she was in kindergarten. The incidents would occur at his house at times in an outdoor hot tub, at the house where A.C. lived with her mother, and during times when Castanedo took A.C. to and from classes. Castanedo at times referred to A.C. by a nickname, his "little cute cute." As A.C. got older, the incidents continued but occurred less often. Castanedo also bought more gifts for A.C. than for his other grandchildren. Castanedo inappropriately touched A.C. in January 2017 while they were in an outdoor hot tub during a trip to Hawaii. After the trip, A.C. was angry and threw tantrums, prompting her mother to contact the school counselor to find out what was wrong.

The incidents stopped in September 2017 when A.C. first reported them to her mother during a trip to a wedding. That weekend A.C. did not want to be left alone with Castanedo, and her mother asked A.C. what was wrong and why she was being mean to her grandfather. When her mother asked if Castanedo had done something to her, A.C. began to cry and nodded yes. Before calling police, A.C.'s mother texted Castanedo to tell him that A.C. had told her what he had done to her and that he should never come over or speak to A.C. again. Castanedo did not respond.

Social worker Deborah Davies interviewed A.C. in October 2017. A.C. brought a list she wrote of the things Castanedo did to her so it would be easier for her to remember the incidents. Some of the incidents she said happened when she was around four, five, and six years old. Among other things, A.C. told Davies that Castanedo tried to take pictures or videos of her while she was showering, and she asked her step-sister K.R. to steal his phone so A.C. could delete the photos.

3

At trial, the prosecution presented Christina Shultz, a supervisor and forensic interviewer for Palomar Health's Child Advocacy Center.[2] Shultz described how her center performed interviews, and explained that her role was as a neutral party and fact-finder. She was asked about common misperceptions about victims of child sexual abuse, with which she was familiar based on her training, expertise and research. She testified it was a general misconception that a child being abused would tell someone about it right away. Rather, she explained, many children would take the secret into adulthood, and studies had shown two thirds of adults said they never told anyone about their abuse during childhood. Shultz testified the majority of abuse was by someone known or trusted by the child, either inside or outside the family but close to the child; the closer the child is to the perpetrator, the less likely the child would disclose the abuse. Thus the closer the relationship the longer the delay. Shultz also testified that victims of abuse did not usually cut off all contact with their abuser because breaking a relationship is difficult to do with a known or trusted person, or an abuser living in the same house. She testified victims continue to appear outwardly normal when in the perpetrator's presence; that there was no way to know 100 percent whether a child is being victimized and not every child reacts the same way. Shultz described some of the outward signs and behaviors victims display, as well as the meaning of delayed, partial or incremental disclosures and grooming. She testified the more bonded the relationship, the more likely the child would delay disclosure and give less information so as to protect the abuser. Shultz identified the types of things that often cause a child to finally disclose the abuse.

---

[2]     Castanedo does not challenge Shultz's qualifications as an expert.

On cross-examination, Shultz testified that her role as an interviewer was not to determine whether the child was telling the truth or lying, but to formulate appropriate questions for the child to talk about events and hope they are providing accurate information about what occurred.[3]

The prosecution also presented M.C., Castanedo's niece, who testified that she first met Castanedo when she was 12, and saw him at a wedding when she was 15 years old after he contributed to her travel expenses. After the wedding, Castanedo began calling M.C. every day. The majority of calls would end with Castanedo crying and telling her he wished they could be together and that he loved her. He also began wiring M.C. money and sending her things like champagne and marijuana. When she was 16 years old, Castanedo once surprised her with a visit where he cried, told her he wished they could be together, said he loved her, gave her an open-mouthed kiss on the mouth for a longer than normal period, hugged her tightly with his pelvis touching, and rubbed her back and arms. M.C. ended contact with Castanedo after he sent her a $500 gift card to a lingerie store and asked her to send him photographs of what she had purchased.

Castanedo's great niece testified for the prosecution that when she was sixteen Castanedo made her uncomfortable by asking her about her sex life

_____

[3]     The following questioning took place on this point: "[Defense counsel:] So in some sense you are—you're hearing what the child says and then taking what the child says as the truth; correct? [¶] [Shultz:] My role as interviewer is not to determine the truth, whether the child is telling the truth or lying. It's really to allow the child—to formulate appropriate questions for a child to be able to tell about an event or events. So I'm not determining truth or lie. The hope is that they're providing accurate information about what occurred. [¶] [Defense counsel:] And that's the hope. So you're assuming that what they're telling you is the truth; right? [¶] [Shultz:] Whatever the truth is."

5

with her high school boyfriend: whether they were having sex, what it was like and how often.

A.C.'s aunt described how when A.C. was between ages three and 12 she would hide or throw a tantrum when Castanedo arrived to pick her up.

Castanedo presented several witnesses in his defense. Two of A.C.'s step-siblings, K.R. and J.R., testified A.C. had not told them her grandfather was touching her inappropriately. K.R. further testified she did not remember A.C. telling her she needed to review Castanedo's cell phone pictures. On cross-examination, however, K.R. testified she would not expect A.C. to tell her something like this because they only talked about "basic" things like school. She admitted Castanedo spoiled A.C. and bought her whatever she wanted. K.R. recalled A.C. often telling her she hated her grandfather very much without explaining why. She also recalled on several occasions A.C. locking herself in her bedroom when Castanedo would come to pick her up. J.R. testified he never saw anything inappropriate happen between A.C. and Castanedo. J.R., however, also observed A.C. lock herself in the bathroom or her bedroom when Castanedo came to pick her up. He agreed Castanedo paid more attention to her than any of the other kids.

Two of Castanedo's son's best friends testified that they attended one birthday party where both Castanedo and A.C. were present, and did not see Castanedo act inappropriately towards A.C. One of the friends testified that while in high school, he never saw Castanedo act inappropriately towards Castanedo's daughter's friends. That witness had never seen Castanedo act inappropriately toward the witness's own eight-year-old daughter or 10-year-old son.

A.C.'s mother's ex-husband testified he never saw Castanedo act sexually inappropriately with A.C. or any other kids  He recalled one incident

6

where A.C. locked herself in her bedroom when Castanedo came to pick her up and she did not want to go with him alone.  A.C. did not leave her room until Castanedo left.

Castanedo's son testified he never saw his father and A.C. in the hot tub or pool together.  He never saw anything that made him think Castanedo's grandchildren hated Castanedo for any reason.  He testified he never observed his father act sexually inappropriately toward A.C.

In addition to instructions on reasonable doubt and what the jury could consider as evidence, the court instructed the jury as to Shultz's testimony, saying:  "You have heard from Christina Shultz regarding child sexual abuse.  And she's the one that we designated.  And it's up to you to decide her level of expertise.  But she's the one who described how the interviews are generally conducted.  [¶]  . . . Shultz's testimony about child sexual abuse is not evidence that the Defendant committed any of the crimes charged against him.  You may consider this evidence only in deciding whether or not [A.C.'s] conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony."

DISCUSSION

I. <em>Admission of Expert Shultz's Testimony</em>

A. *Testimony on Child Sexual Abuse Accommodation Syndrome and Related Theories*

Before trial, on the parties' respective evidentiary motions, the trial court ruled that expert Shultz could testify about certain characteristics of child sexual abuse victims—commonly referred to as "child sexual abuse accommodation syndrome" or CSAAS (see *People v. Munch* (2020) 52 Cal.App.5th 464, 465)—reasoning it was helpful for the jury to understand how a child may react in disclosing the abuse.  In response to defense

7

counsel's argument that jurors were generally educated about sex abuse victims from the media, the court agreed with the prosecutor that the jury would be assisted by someone with empirical data who had done research in the area, as opposed to relying on information jurors may normally hear.

Castanedo contends the trial court prejudicially erred by allowing over his objection Shultz's opinions on these issues. He concedes such testimony may be relevant to dispel misconceptions or to rehabilitate the victim's credibility when the defendant suggests the victim's post-abuse conduct is inconsistent with his or her claims of abuse. Castanedo maintains such evidence is irrelevant and inadmissible to prove a crime occurred, and it is not proper for the expert to present "general" testimony or " 'predictive conclusions,' " which he argues go beyond the scope of the child sexual abuse evidence and may confuse the jury. Castanedo argues Shultz's testimony was irrelevant and improper because his defense counsel did not focus on A.C.'s delay in disclosure; he did not seek to educate the jury on misconceptions about child sexual abuse, nor did he try to prove A.C. did not act like other child sexual abuse victims. Rather, his defense was that the acts did not occur and he was not guilty, and thus the evidence violated his constitutional right to a fair trial.

Under California law, all relevant evidence is admissible except as otherwise provided by statute. (Evid. Code, § 351.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "Evidence Code section 801 'qualifies a matter as the proper subject for expert testimony if it is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." That is not to say, however, that the jury need be wholly ignorant of the subject matter of the

expert opinion in order for it to be admissible. [Citation.] Rather, expert opinion testimony " 'will be excluded only when it would add *nothing at all* to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that [people] of ordinary education could reach a conclusion as intelligently as the witness" ' [citation]." ' " (*People v. Dalton* (2019) 7 Cal.5th 166, 236-237; see also *People v. Morales* (2020) 10 Cal.5th 76, 97 [relating admissibility standards for expert testimony].) This court reviews the trial court's decision on admissibility for abuse of discretion. (*Morales*, at p. 97; *People v. Duong* (2020) 10 Cal.5th 36, 60.) "Specifically, we will not disturb a trial court's admissibility ruling ' "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Morales*, at p. 97.)

We conclude the court did not abuse its "wide discretion" in finding the expert testimony relevant and admissible. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1303 (*McAlpin*).) "Expert testimony on 'the common reactions of child molestation victims,' known as CSAAS theory evidence, 'is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation.' [Citation.] ' "Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior." ' " (*People v. Julian* (2019) 34 Cal.App.5th 878, 885; see also *McAlpin*, at p. 1301; *People v. Brown* (2004) 33 Cal.4th 892, 906; *People v. Munch*, *supra*, 52 Cal.App.5th at p. 468.)

CSAAS evidence, however, " 'is not admissible to prove that the complaining witness has in fact been sexually abused.' " (*People v. Julian*,

9

*supra*, 34 Cal.App.5th at p. 885.) Further, it is not proper for an expert to present so called "predictive conclusions" such as testimony that child abuse victims should generally be believed or are credible despite inconsistent accounts. (*Julian*, at p. 886, quoting *People v. Bowker* (1988) 203 Cal.App.3d 385, 394.) "Where expert opinions on the statistical probability of guilt are admitted, the jury may be 'distracted' from its 'requisite function of weighing the evidence on the issue of guilt,' and may rely instead on this 'irrelevant' evidence." (*Julian*, at p. 886.) In *Julian*, for example, an expert testified about statistical data on false allegations and gave a percentage range of false allegations. (*Id.* at pp. 883-884.) The Court of Appeal held that his "statistical probability testimony went beyond the permissible scope of CSAAS evidence, was highly prejudicial, and deprived [the defendant] of his right to a fair trial." (*Id.* at p. 885; accord, *People v. Wilson* (2019) 33 Cal.App.5th 559, 571 [finding the same expert's testimony inadmissible; it "had the effect of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth" and even though it was not directed at the actual victims, "the practical result was to suggest to the jury that there was an overwhelming likelihood their testimony was truthful"].)

Here the evidence was that A.C.'s molestation began in 2009 when she was in kindergarten but A.C. did not report it to her mother until years later in September 2017. A.C. testified that at some point she related events involving her grandfather to her step-siblings as if she were telling them a story, but when they responded with surprise and said they would tell their

10

parents including A.C.'s mother, A.C. said she was just kidding.[4] Further, Castanedo's counsel cross-examined A.C. to elicit that as she got older she did not tell her aunts, even though they were close with A.C.'s mother. Castanedo presented evidence from A.C.'s step-siblings that A.C. had not told them her grandfather was touching her inappropriately. Such testimony permits not just an inference that Castanedo did not commit the acts as Castanedo urges, but also that A.C.'s conduct—her failure to report the abuse or her remark that she was "kidding" about the abuse she described—is consistent with a child who has been sexually abused. Under the circumstances, the jury may have questioned A.C.'s reluctance to talk about the abuse and her decision to wait as long as she did to report it. Given A.C.'s close familial relationship with Castanedo, Shultz's testimony concerning CSAAS was relevant to explain any faulty assumptions concerning when and how a child victim of sexual abuse may come forward about the abuse and that the failure to immediately report abuse or later minimize the abuse is not inconsistent with someone who suffered sexual abuse. It helped disabuse any misconceptions the jury may have formed based on A.C.'s prolonged delay in reporting Castanedo's abuse. (*McAlpin*, *supra*, 53 Cal.3d at p. 1301.) Further, the court instructed the jury that it was not compelled to accept Shultz's testimony and the testimony was not evidence that Castanedo committed any of the charged crimes; it could only consider her testimony when deciding whether A.C.'s conduct was not inconsistent with the conduct of someone who has been molested and in

---

[4]    On further questioning, A.C. explained that she did not know why she said she was kidding; she guessed she "was scared of my parents to know" and "didn't know if anyone would take my side or I'd have to deal with it and stuff."

11

evaluating the believability of her testimony. We presume the jury obeyed these instructions. (*People v. Flinner* (2020) 10 Cal.5th 686, 717.)

The prosecutor did not use Shultz's testimony to prove Castanedo committed the sex acts against A.C., but rather told the jury: "[Y]ou can consider [Shultz's] testimony not of the Defendant's guilt, but you can consider it when you're looking at how [A.C.] acted over the years. CALCRIM [No.] 1193 tells us you can consider that testimony to decide whether her conduct was consistent with a victim of child sexual abuse. You can use that knowledge that you gained from Christina Shultz to determine whether or not [A.C.] is believable, whether or not she's credible." The relevance inquiry requires that we decide whether Shultz's testimony would "at least in some degree" (*McAlpin, supra*, 53 Cal.3d at p. 1300) assist the jury in understanding an area outside of their common knowledge and whether it was directed at a myth or misconception raised by the evidence. (*Id*. at pp. 1299-1300.) Here, the court did not abuse its discretion in deciding it would do so in this case.

We disagree that Shultz's testimony rose to the level of telling the jury there was an overwhelming likelihood that A.C. was testifying truthfully by providing statistics as to false allegations or the veracity of sexual abuse victims, as the expert improperly did in *People v. Julian, supra*, 34 Cal.App.5th 878 and *People v. Wilson, supra*, 33 Cal.App.5th 559. Nothing in Shultz's remarks vouched for A.C.'s truthfulness or the truthfulness of the People's evidence. To the contrary, Shultz testified generally about interviewing child abuse victims without referencing A.C.; on cross-examination she confirmed she did not know the facts of A.C.'s case and testified the role of an interviewer was not to determine whether the child

12

was telling the truth or lying, but to formulate questions to enable the child to talk about events.

Relying in part on *People v. Jeff* (1988) 204 Cal.App.3d 309, Castanedo nevertheless maintains that because Shultz addressed the sort of circumstances involved in A.C.'s case—late or incremental disclosures, abusers not being strangers, and grooming—her testimony "convey[ed] an overwhelming likelihood A.C. was being truthful." He argues that "the prosecution elicited [Shultz's] testimony not to rehabilitate A.C. but to prove she was credible" and that "the jury should believe [A.C.] and find [he] committed all the alleged acts," thereby invading the jury's province. He also argues A.C. did not recant her statements about the alleged acts, distinguishing this case from others in which CSAAS testimony was admitted to explain why some sexually abused children will deny or recant abuse. We cannot agree with this characterization of Shultz's testimony or the inferences that can be drawn from it. Shultz was asked straightforward questions such as, "Are you familiar with the phrases delayed disclosure, partial disclosure, incremental disclosure?" or, "Are you familiar with what grooming is?" She was then asked to describe or explain the terms without referring to A.C. or responding to hypotheticals that reflected exact details of

A.C.'s experiences.[5]  And A.C. did testify that she told her step-siblings she was "kidding" when they reacted to her talking about her grandfather's abuse.  This is the sort of "apparently self-impeaching behavior" that CSAAS evidence is designed to help the jury understand.  (See *People v. Munch*, *supra*, 52 Cal.App.5th at p. 474; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504.)[6]

---

[5]  For example, as to grooming, Shultz was asked to explain what the term meant, and stated:  "So grooming is a phrase or term referring to the different behaviors or techniques that an abuser will use to maintain the trust of the child but also the caretaker's.  And really these things are done to ensure that the—that their secret will be kept secret, to keep the child quiet and silent."  When asked to describe "[w]hat sorts of behaviors are considered grooming behavior," she said:  "So, again, grooming, the caretaker would really be portraying oneself as very trusted, a nice guy.  You know, very, maybe, giving.  Very helpful.  That's grooming to the caregiver.  Grooming to the child can be a variety of things, such as giving gifts, giving special time.  Compliments.  Really making this to be a very exceptional, very special relationship and really portraying that to the child.  These sorts of things can be considered grooming."  Shultz did not respond to " 'hypothetical questions' incorporating the exact same facts and details as told by [A.C. to a clinical social worker]" or explain that A.C.'s reactions were the symptoms exhibited by a child molest victim so as to tell the jury they should accept A.C.'s testimony as true, which was the improper testimony that deprived the defendant of a fair trial in *People v. Jeff* (*supra,* 204 Cal.App.3d at pp. 337-339).

[6]  The court in *Munch* rejected the defendant's claim that a jury instructed that it may use CSAAS evidence "in evaluating the believability" of the child's testimony would improperly use a CSAAS expert's testimony as evidence of guilt, explaining:  " 'The purpose of CSAAS is to understand a child's reactions when they have been abused.  [¶]  A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the child's] behavior does not mean she lied when she said she was abused.  The jury also would understand it cannot use [the expert's] testimony to conclude [the child] was, in fact, molested.  *The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior.*  Thus, under CALCRIM No. 1193, a juror who believes [the expert's]

It is not the case that CSAAS expert evidence may only be used to rebut defense attacks on a victim's credibility. Where a victim's testimony puts their own credibility at issue as A.C.'s did here, CSAAS psychological testimony may be properly admitted to rehabilitate the victim and explain the pressures that sometimes cause molestation victims to delay reporting or falsely recant their claims of abuse. (See, e.g., *People v. Housley* (1992) 6 Cal.App.4th 947, 956 [cases sometimes suggest that expert CSAAS testimony only may be used to rebut defense attacks on a victim's credibility, but where victim "directly placed her credibility in issue by retracting her molestation claims and offering a new story at trial" such testimony was properly admitted]; accord, *People v. Harlan* (1990) 222 Cal.App.3d 439, 449-450 [where prosecutor identified misconceptions about victims' behavior such as delayed disclosure and inconsistent statements, trial court did not err in permitting CSAAS expert to testify despite defendant's claim he did not put in issue any of the paradoxical behaviors of child molestation victims such as recantation].)

B. *Claim that Shultz Related Opinions of Nontestifying Experts*

Castanedo contends the court erred by allowing Shultz to relate opinions of other nontestifying experts, which constituted inadmissible hearsay and violated his right to confront and cross-examine witnesses absent a showing of unavailability or prior opportunity for cross-examination.

---

testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested.' " (*People v. Munch*, *supra*, 52 Cal.App.5th at p. 474, quoting *People v. Gonzales*, *supra*, 16 Cal.App.5th at p. 504.)

He specifically points to the information that Shultz related in response to questioning about "stranger danger:"

"[Prosecutor:] Can you just tell us—and I think we touched on material on—about stranger danger versus nonstranger danger, if that's a fair way to phrase it.

"[Shultz:] Sure. And even in terms of sexual abuse I think this was a term that the public would—again assuming that the people that were abusing children were strangers. [¶] But, again, we know that more than 90 percent of the time, the child—the abuser is not a stranger. It is somebody well known to the child, well known to the family and trusted. So that's kind of a thing of the past, the stranger danger."

Castanedo maintains this exchange, particularly the 90 percent information, was hearsay offered for its truth "to inform jurors that other experts, like Shultz, believed that appellant being [A.C.'s] grandfather was consistent with other child sexual abuse victims." He suggests the evidence was like that statistical evidence held improper in *People v. Wilson*, *supra*, 33 Cal.App.5th 559, arguing the evidence "invited the jury to decide the issue of guilt based on unexplained statistical data, concluding that because the majority of sexual abuse victims had as their abuser someone who they trusted and was not a stranger, appellant fit the profile and was likely guilty of the charges."

While it is true that the court in *People v. Campos* (1995) 32 Cal.App.4th 304, stated an expert witness may not "on direct examination, reveal the content of reports prepared or opinions expressed by nontestifying experts" (*People v. Campos*, at pp. 307-308), that court has since explained *Campos* should not be read to suggest an expert could never refer during direct examination to the contents of another expert's report. (*People ex rel.*

*Dept. of State Hospitals v. S.M.* (2019) 40 Cal.App.5th 432, 442-443.) Before making the challenged statement, Shultz testified that she had been conducting forensic interviews of child victims for close to fifteen years and had conducted over 2,000 interviews. She explained she was a board member of the Child Advocacy Centers of California, and her training required her to read research, literature, attend trainings and participate in peer review to maintain her skills and stay current. When asked whether reporting by victims was influenced by an abuser who told them not to tell, she explained, "Well, we know that children who are abused by a stranger, which actually constitutes a pretty small percentage of the sexual abuse cases, in those cases . . . [w]e see that kids likely will tell right away. [¶] But . . . the majority of abuse is happening by somebody known and trusted to the child, somebody within the family or even outside of the family but somebody close to the child. And so what we know is that the closer the child is to the perpetrator, the less likely they're going to tell."

It is not clear that in the challenged portions of her testimony Shultz was relating a statistic from another non-testifying expert versus information from a research study of a kind an expert may reasonably rely. (Evid. Code, § 801; *People v. Caitlin* (2001) 26 Cal.4th 81, 137 [expert may base opinion on any "matter" known to her, including inadmissible hearsay, as long as that matter may be reasonably relied on for that purpose].) The 90 percent reference could have been Shultz's own estimate from personal experience conducting more than 2000 forensic interviews. On this record we cannot say that Shultz violated the rule expressed in *People v. Campos, supra,* 32 Cal.App.4th 304, which is confined to instances where an expert introduces " 'multiple [expert] opinions, insulated from cross-examination, into

evidence.' " (*People ex rel. Dept. of State Hospitals v. S.M.*, *supra*, 40 Cal.App.5th at p. 442; see also *People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1326.)[7]

Further, because Shultz had already related that the majority of child victims were abused by persons known to them such as a family member or close friend, her fleeting reference to the 90 percent statistic was not prejudicial or a miscarriage of justice. (Accord, *People ex rel. Dept. of State Hospitals v. S.M.*, *supra*, 40 Cal.App.5th at p. 443; *People v. Campos*, *supra*, 32 Cal.App.4th at pp. 308-309.) In short, it is not reasonably probable that a result more favorable to Castanedo would have been reached in the absence of the challenged evidence. (*Ibid.*)

## II. *Claim of Prosecutorial Misconduct*

Castanedo contends the prosecutor committed prejudicial misconduct during closing arguments in several ways, violating his constitutional rights to due process and a fair trial. He acknowledges his counsel did not object to all of the challenged remarks, but he contends an objection and request for admonition would have been harmful as calling more attention to what was said, making the prejudice worse. Castanedo maintains this court may review the issues in any event notwithstanding counsel's failure to preserve

---

7       Toward the outset of her testimony, Shultz talked about the misconception that if a child is being abused they would tell right away, explaining "[w]hat we know through research is we know that many kids do not tell during adulthood. A lot of this information that we get [is] through what we call retrospective studies. So studies, phone call surveys that are given to adults asking about their experiences as children and one question being history of sexual abuse." Shultz testified that those surveys showed that two-thirds of respondents never told anybody during childhood." Castanedo does not challenge those portions of Shultz's testimony.

them.  Alternatively, he argues his counsel was prejudicially ineffective for the omission.

We agree that to the extent Castanedo did not object to the prosecutor's remarks, he has forfeited his challenge.  (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1164 [" 'It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal' " and record did not suggest a timely objection would have been futile or insufficient]; *People v. Peterson* (2020) 10 Cal.5th 409, 464-465.)  There is no indication on this record that the court signaled it would overrule counsel's objections or reject requests for an admonition.  (Accord, *People v. Centeno* (2014) 60 Cal.4th 659, 674.)  Nor were the prosecutor's arguments so extreme or pervasive that a prompt objection and admonition would not have cured the harm.  (*Ibid.*; compare *People v. Hill* (1998) 17 Cal.4th 800, 821 [counsel engaged in a "constant barrage" of unethical misstatements, demeaning sarcasm, and outright falsehoods, and risked "repeatedly provoking the trial court's wrath, which took the form of comments before the jury suggesting [defense counsel] was an obstructionist [who was] delaying the trial with 'meritless' objections"].)  An objection can always be characterized as calling attention to what was said, so we decline to hold that that circumstance alone shows futility or inability to cure.  Accordingly, to the extent Castanedo objected, we will address the merits of the claim.  As to the other remarks, we address Castanedo's ineffective assistance claim, dealing with each claim of alleged misconduct seriatim.

A.  *General Legal Principles and Standard of Review*

" 'A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a

denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact.' [Citation.] 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' [Citation.] 'When attacking the prosecutor's remarks to the jury, the defendant must show' that in the context of the whole argument and the instructions there was ' "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." ' " (*People v. Silveria* (2021) 10 Cal.5th 195, 306; see *People v. Johnsen, supra,* 10 Cal.5th at p. 1164.) A reviewing court faced with a claim that a prosecutor's comments constituted misconduct, " 'do[es] not lightly infer' " the prosecutor " 'intended [his (or her) remarks] to have their most damaging meaning, or that the jury would draw that meaning from the other, less damaging interpretations available.' " (*People v. Young* (2005) 34 Cal.4th 1149, 1192.)

If a forfeiture occurs from counsel's failure to object to asserted misconduct, the defendant may make a claim of ineffective assistance. "To demonstrate ineffective assistance of counsel, [Castanedo] 'must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.' [Citation.] On direct appeal, a finding of deficient performance is warranted where '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' [Citation.] '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no

20

conceivable reason for counsel's acts or omissions.' " (*People v. Johnsen, supra*, 10 Cal.5th at p. 1165.)  " '[T]he decision . . . whether to object to comments made by the prosecutor in closing argument is a highly tactical one.' " (*Ibid*.)  Furthermore, counsel is not ineffective for failing to object when an objection is meritless.  (See *People v. Peterson, supra*, 10 Cal.5th at p. 465; *People v. Farnam* (2002) 28 Cal.4th 107, 186, fn. 36 ["Counsel had no obligation to interpose meritless objections"].)

B.  *Claim that the Prosecutor Elicited Sympathy for the Victim*

Castanedo contends the prosecutor improperly elicited sympathy for A.C. by referring to A.C. having to talk to someone about Castanedo touching her and the list she wrote to help her memory.  More specifically, Castanedo complains about the prosecutor's statement:  "[A.C. is] told by her mom she has to go talk to someone about what happened.  How do you think that feels as a twelve year[ ]old?  So what does she do?  That morning without telling anyone she writes out a list called Things He Did To Me, a list no kid should ever have to write."  Castanedo complains about the prosecutor telling the jury that A.C. "wrote things that kids her age shouldn't know" and asking them, "[D]id you see the visceral reaction that she had here in court when she had to say ["my little cute cute"] out loud?"  Castanedo also points to the prosecutor's remark:  "[A.C.] is not an actress.  She's a real child, coming in here, talking about things that real kids shouldn't have to talk about."

" '[A]n appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial; an appeal for sympathy for the victim is out of place during an objective determination of guilt.' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1344; *People v. Young* (2019) 7 Cal.5th 905, 933.)  But " '[t]he prosecutor is entitled to comment on the credibility of witnesses based on the evidence adduced at trial.' " (*People v. Young, supra*,

21

34 Cal.4th at p. 1190.) And in determining the credibility of a witness, a juror is permitted to consider "any matter that has any tendency in reason to prove or disprove the truthfulness" of the witness, including the witness's "demeanor while testifying and the manner in which [the witness] testifies." (Evid. Code, § 780, subd. (a).)

Were we to view the comment, "How do you think that feels as a twelve year[ ]old?" in isolation, it could be construed as a possible appeal to the jurors to put themselves in A.C.'s position. But the remark was made in the broader context of discussing not only the background facts of A.C.'s interviews with detectives and social workers, but A.C.'s credibility, observing that her statements were "consistent with everything she'd been saying" and that her emotions in the courtroom were "real emotions based on

real abuse."[8]  Under the circumstances, defense counsel was not prejudicially ineffective for failing to object to the remarks, because they were not misconduct but proper comments on A.C.'s credibility based on the evidence.

---

[8]    In a fuller context, following the prosecutor's statement about A.C. writing out her list that "no kid should ever have to write," the prosecutor said: "And then she's interviewed by a professional with detectives and social workers sitting in the next room being video recorded, having to tell details of what her grandpa did to her, having to talk about how she had to put her mouth on her grandpa's private parts, having to look at gingerbread drawings. [¶] She was interviewed for, what, an hour and forty minutes talking about this stuff?  She was consistent with everything she'd been saying.  Was she able to talk about all that stuff?  Is it weird to us that a twelve-year-old girl can't talk about the sexual acts she's been committing, that her grandpa made her commit since she was five?  [¶] So she had to write things down and then she wrote more notes.  She wrote things that kids her age shouldn't know.  That she would have to use her mouth.  [¶] Do you remember what she said in the interview when she was asked what would happen to his private part when she would have to put her mouth on it?  Do you guys all remember that?  She cringed.  She cried.  And she started writing."  After discussing A.C.'s visceral reaction to Castanedo's nickname for her, the prosecutor said, "That's real.  Those are real emotions based on real abuse.  That's not a little girl making up some story.  Those are the types of details that tell you that what she's saying is the truth, and she reacted the same way in the forensic interview."

Moreover, the comment was fleeting and in the context of the People's much longer closing argument, as well as the strength of A.C.'s testimony,[9] we cannot say it is reasonably probable the outcome of the trial was affected by Castanedo's counsel's asserted failings or the prosecutor's remarks. Thus, we conclude any deficiency in defense counsel's performance did not result in prejudice. (Accord, *People v. Seumanu, supra,* 61 Cal.4th at p. 1344 [prosecutor committed misconduct asking jury to imagine themselves in the victim's shoes, but misconduct did not result in prejudice given strong

---

[9] Castanedo describes the People's case as not overwhelming. He bases this statement on testimony by A.C.'s grandmother that A.C.'s *mother* had once told her that her soon-to-be ex-husband had inappropriately touched A.C., but later recanted the accusation. A.C.'s grandmother testified that A.C. never accused her mother's husband of inappropriately touching her. Castanedo points to the jury's request to review A.C.'s testimony and her interview. Castanedo also points to the jury's not guilty verdicts on counts 21 and 22 (alleging incidents of Castanedo using his hand to touch A.C.'s vagina in his vehicle) out of 30 alleged counts. He refers to A.C.'s testimony that she told her step-siblings she was kidding about her grandfather's abuse. But given Shultz's testimony, the jury could conclude A.C.'s "kidding" remark was entirely consistent with a child abuse victim. The jury began its deliberations at about 9:45 a.m. on the morning of July 25, 2019, and even with a read-back of A.C.'s testimony, it reached its verdicts on the remaining 28 counts by about 4:30 p.m. that same day. Though A.C.'s testimony may have been a "point of discussion" (*People v. Zaheer* (2020) 54 Cal.App.5th 326, 340), it is clear given the number of charges and allegations and relatively short period of deliberations that the jury was easily able to resolve any issues about her credibility. (Accord, *People v. Taylor* (1990) 52 Cal.3d 719, 732 [rejecting claim that case was close considering the gravity of the jury's task based on multiple charges and special circumstance allegations].) Under these circumstances, we cannot see this as the jury rejecting the prosecutor's case (compare *People v. Vasquez* (2018) 30 Cal.App.5th 786, 802-803) or presenting a close case such that in the absence of any defense counsel error there was a reasonable probability of a different result. (*Strickland v. Washington* (1984) 466 U.S. 668, 693-694; *People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.)

evidence of guilt and because the "few remarks [were made] in a much longer closing argument, and an even longer trial"].)  We cannot agree the prosecutor's argument rendered the trial fundamentally unfair or otherwise infected it with such unfairness as to violate Castanedo's constitutional rights.  (*Id.* at p. 1345.)

With regard to the remainder of the prosecutor's challenged comments, there was no misconduct in the prosecutor commenting on A.C.'s demeanor while testifying or the fact she was not an actress but a "real child" having to talk about unpleasant things.  A prosecutor has a " ' "wide-ranging right to discuss the case during closing argument [and to] fully state [his] views as to what the evidence shows and to urge whatever conclusions [he] deems proper.  Opposing counsel may not complain on appeal if the reasoning is faulty or the conclusions are illogical because these are matters for the jury to determine." ' "  (*People v. Seumanu*, *supra*, 61 Cal.4th at p. 1342; *People v. Young*, *supra*, 7 Cal.5th at p. 933 [prosecutor can properly cite evidence and ask jury to draw logical inferences from it].)  Further, in determining the credibility of a witness, a juror is permitted to consider "any matter that has any tendency in reason to prove or disprove the truthfulness" of the witness, including the witness's "demeanor while testifying and the manner in which [the witness] testifies." (Evid. Code, § 780, subd. (a).)  It was not misconduct for the prosecutor to comment on A.C.'s demeanor or reaction while A.C. testified about her grandfather's nickname for her.  The rest of the prosecutor's challenged statements were fair comments on the evidence presented at trial about A.C. having to undergo an unpleasant interview to discuss Castanedo's abuse.  These arguments fall within the bounds of proper argument by a prosecutor, thus defense counsel was not ineffective for failing to object to them.

Finally, the court instructed the jury: "Do not let bias, sympathy, prejudice, or public opinion influence your decision." Again, we presume the jury followed this instruction. (*People v. Flinner, supra,* 10 Cal.5th at p. 717; *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 857.) There was no prejudicial misconduct in these remarks. Castanedo has not demonstrated prejudice resulting from his counsel's inaction.

C. *Claim that the Prosecutor Misrepresented the Burden of Proof*

Citing *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*), Castanedo contends the prosecutor impermissibly shifted the burden of proof when he pointed out that Castanedo responded with "silence" after A.C.'s mother told him via text message never to contact them again. Castanedo points to the prosecutor's remarks that his silence "speaks volumes" and suggestion that an innocent person would have written back: "Innocent grandpa, fun-loving didn't-do-anything-wrong grandpa writes back: What are you talking about? Doing what? [¶] Innocent grandpa doesn't walk away from his daughter, [or] his 'little cute cute' and the apple of his eye granddaughter."[10] Castanedo additionally points to the prosecutor's question and answer: "Why? [¶] 'Cause he knew. He knew what he had been doing. He didn't need anyone to tell him. The jig was up and he walked away." According to Castanedo, while the prosecutor's remarks did not refer to his failure to testify, "the inference was that [he] had the burden to dispute what [A.C.] accused him of, that because he did not respond to the message, this showed he was not an 'innocent grandpa' but a guilty one." Castanedo argues this was misconduct because he did not have the burden of proof, and the prosecutor did not immediately correct the misstatement by telling the jury the prosecution bore the burden of proof and Castanedo had no duty to produce evidence. He

---

[10] The court overruled Castanedo's counsel's objection to this remark.

asserts "[t]he jury was left likely drawing a negative inference on [his] failure to explain himself."

*Griffin*, *supra*, 380 U.S. 609 prohibits a prosecutor from commenting on a defendant's failure to testify at trial. (*People v. Tom* (2014) 59 Cal.4th 1210, 1223; *People v. Brady* (2010) 50 Cal.4th 547, 565; *People v. Vargas* (1973) 9 Cal.3d 470, 475.) But the Fifth Amendment privilege underlying *Griffin* "does not categorically bar the prosecution from relying on a defendant's pretrial silence." (*Tom*, at p. 1223; *Vargas*, at p 475.) The prosecutor may use a defendant's pre-arrest silence in response to an incriminating question as substantive evidence of guilt, provided the defendant has not invoked the privilege against self-incrimination. (*Tom*, at p. 1223.) Further, the *Griffin* rule "does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses." (*Brady*, at p. 566.) Courts evaluate claims of *Griffin* error by inquiring whether there is a reasonable likelihood that any of the challenged comments could have been understood to refer to a defendant's failure to testify. (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1523.)

Castanedo claims that the prosecutor's remarks impermissibly shifted the burden of proof to him, so we will inquire whether, in context, there is a reasonable likelihood the jury would understand the prosecutor's remarks to refer to Castanedo having the burden of proving his innocence or otherwise misrepresenting the burden. (See *People v. Champion* (2005) 134 Cal.App.4th 1440, 1448 ["An assessment of whether the prosecutor made appropriate use of [a] defendant's post[-]arrest silence requires consideration of the context of the prosecutor's inquiry or argument"].) We conclude there is no reasonable likelihood the jury would have so understood the prosecutor's remarks. The court explained just before closing arguments that

27

the People had the burden of proof, meaning the burden of proving Castanedo guilty beyond a reasonable doubt. During his remarks about A.C.'s mother's text message, the prosecutor did not refer to any "burden of proof" or suggest he was discussing trial burdens; he clearly was referring to Castanedo's pretrial silence in response to A.C.'s mother's accusatory text message. (Accord, *People v. Clair* (1992) 2 Cal.4th 629, 663 [rejecting defendant's claim of *Griffin* error for prosecutor's comments bearing on the defendant's "pretrial silence or equivocal response in the face of [his girlfriend's] accusations" during a phone call tape-recorded by police]; *People v. Bethea* (1971) 18 Cal.App.3d 930, 936 [no error when prosecutor summarized the evidence and commented that " '[t]he state of the record is that there has been no explanation given for this [evidence of guilt]' "; in such case, "There is absolutely no reference to the fact that defendant did not take the stand, nor is the remark susceptible of such interpretation by inference or innuendo"].) Elsewhere in his closing argument regarding the uncharged crimes against M.C. and K.R., the prosecutor told the jury they could use that evidence but he "[s]till ha[d] to prove the charges beyond a reasonable doubt."

While the prosecutor clearly meant the jurors to draw a negative inference of guilt from Castanedo's pretrial silence, that was permissible. (*People v. Tom*, *supra*, 59 Cal.4th at p. 1223.) But we cannot agree that the prosecutor's statement suggested the jury draw an inference about the trial burdens or insinuated that Castanedo should have presented evidence in his own defense.

D. *Claim that the Prosecutor Misstated the Law*

Citing *Cage v. Louisiana* (1990) 498 U.S. 39, 41 (disapproved on another point in *Estelle v. McGuire* (1991) 502 U.S. 62, 72-73, fn. 4) and *U.S. v. Byrd* (2nd Cir. 1965) 352 F.2d 570, Castanedo contends the prosecutor

misrepresented the law and gave an inaccurate definition of proof beyond a reasonable doubt when in rebuttal he argued to the jury: "It's if you have a reasonable doubt. The law doesn't say if you have any uncertainty, he's not guilty. That's not the law. So you need to focus on the evidence and the law." According to Castanedo, the remark allowed the jury to find him guilty based on a degree of proof below that which the Constitution requires, and "jurors would have believed if they were uncertain if the prosecution proved [he] was guilty, this did not mean they had reasonable doubt and could find [him] not guilty." He argues, "Jurors could have been uncertain, the uncertainty the equivalent of being without an 'abiding conviction' that the charge was true, and found [him] not guilty."

It is important to put the prosecutor's remark in context. When making it, the prosecutor was in the process of reminding the jury that what the attorneys say was not evidence and "what we tell you the law is isn't the law." The prosecutor said, "The law are [*sic*] the instructions that the judge is going to give you. So when defense counsel stood up here yesterday and talked to you about what reasonable doubt means—I'm going to talk to you a little bit more about that instruction." The prosecutor then stated: "[T]he law isn't if you have any doubt, he's not guilty. No. It's if you have a reasonable doubt. The law doesn't say if you have any uncertainty, he's not guilty. That's not the law. So you need to focus on the evidence and the law. Not what we say. Because you determine the truth and verdicts in this case."

We conclude Castanedo's counsel was not ineffective for failing to object to these remarks because they do not amount to reversible misconduct. To determine whether a prosecutor has committed such misconduct in context of a claim he or she misstated the reasonable doubt standard, we examine (1) whether it was reasonably likely that the prosecutor's statements misled the

29

jury on reasonable doubt and (2) whether there is "a reasonable probability that the prosecutor's argument caused one or more jurors to convict defendant based on a lesser standard than proof beyond a reasonable doubt." (*People v. Centeno, supra*, 60 Cal.4th at pp. 674, 677; *People v. Johnsen, supra*, 10 Cal.5th at pp. 1165-1166.)

Here, the prosecutor's statements were not reasonably likely to mislead the jury about the reasonable doubt standard. The prosecutor was telling the jury to not listen to either counsel's interpretation of the law, but to follow the court's instructions. He was explaining that the court's instruction on reasonable doubt did not say the jury must find the defendant not guilty if jurors held "any uncertainty," which is an accurate statement about the version of CALCRIM No. 220 given to the jury. The prosecutor was not purporting to define the concept of reasonable doubt. (Compare *People v. Johnsen, supra*, 10 Cal.5th 1116, 1166 [prosecutor's comment that reasonable doubt required jurors "to point to something in the evidence that makes them have that doubt" was misconduct, as it was reasonable to construe it to preclude jurors from having reasonable doubt solely based on the insufficiency of the People's evidence]; *People v. Hill, supra*, 17 Cal.4th at pp. 831-832 [prosecutor's statement on the reasonable doubt concept: " 'There must be *some evidence* from which there is a reason for a doubt. You can't say, well, one of the attorneys said so' " was misconduct because it was "reasonably likely" the jury understood the prosecutor's comment "to mean defendant had the burden of producing evidence to demonstrate a reasonable doubt of his guilt"].) We fail to see the applicability of *Cage v. Louisiana, supra*, 498 U.S. 39, in which the *court* was held to have misinstructed the jury on reasonable doubt, by stating it "*must be such doubt as would give rise to a grave uncertainty . . . [i]t is an actual substantial doubt*" and its negation

30

involves a "*moral certainty.*" (*Id.* at p. 40.) Instructing the jury with these phrases violated due process by suggesting to the jurors "a higher degree of doubt than is required for acquittal under the reasonable doubt standard." (*Id.* at p. 41.) *U.S. v. Byrd*, *supra*, 352 F.2d 570 similarly involved a court misinstructing a jury on the meaning and application of reasonable doubt, stating, " 'It is a doubt to a moral certainty.' " (*Id.* at p. 575.) These cases do not persuade us that the prosecutor in this case committed misconduct such that Castanedo's counsel was prejudicially ineffective for failing to object.

Further, even if we were to assume the prosecutor misstated the law, we would conclude it was not reasonably likely the prosecutor's statements caused one or more jurors to convict Castanedo on a standard lower than that beyond a reasonable doubt. (Accord, *People v. Johnsen*, *supra*, 10 Cal.5th at p. 1167.) The trial court correctly instructed the jury on reasonable doubt. That is, it instructed them that "[a] defendant in a criminal case is presumed to be innocent" and "[t]his presumption requires that the People prove a defendant guilty beyond a reasonable doubt." The court told the jury that "[p]roof beyond a reasonable doubt is proof that leaves with you an abiding conviction that the charge is true."[11] It further told the jurors they "must follow the law as I explain it to you even if you disagree with it," and, "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." These instructions mitigated any

---

[11] The court went on to instruct: "The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves a defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

misimpression the prosecutor's remarks would have given the jury. (*Johnsen,* at pp. 1167-1168.)

### III. *Abstract of Judgment*

The reporter's transcript for Castanedo's sentencing hearing shows that the trial court sentenced Castanedo to eight-year upper terms on counts 13 and 14 (the upper term at the time the offenses were committed). Castanedo's abstract of judgment, however, reflects 12-year terms for those counts. The court's oral pronouncement controls. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) This court is authorized to correct clerical errors on our own motion. (§ 1260; *Mitchell*, at p. 185; *People v. Amaya* (2015) 239 Cal.App.4th 379, 385.) We direct the trial court to correct the errors and forward a certified copy of the corrected abstract of judgment to the California Department of Corrections and Rehabilitation.

## DISPOSITION

The judgment is affirmed. The trial court is directed on remand to correct the abstract of judgment to reflect eight-year upper terms on the Penal Code section 288, subdivision (b)(1) offenses of counts 13 and 14, and forward a certified copy of the corrected abstract of judgment to the California Department of Corrections and Rehabilitation.

O'ROURKE, J.

WE CONCUR:

HALLER, Acting P. J.

DATO, J.